# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SUSAN G. GRIPPO, | ) |
| | ) No. 12 CV 6016 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner, Social Security | ) |
| Administration,[1] | ) |
| | ) February 18, 2014 |
| Defendant. | ) |

## MEMORANDUM OPINION and ORDER

Susan Grippo seeks disability insurance benefits ("DIB"), *see* 42 U.S.C. §§ 416(i), 423, based on her claim that she is unable to work because of arthritis of the lumbar spine and right knee, obesity, and diabetes. After her application was denied in a final decision by the Commissioner of the Social Security Administration, Grippo filed this suit seeking judicial review. *See id.* § 405(g). Before the court is Grippo's motion for summary judgment seeking reversal of the Commissioner's decision. For the following reasons, the motion is granted to the extent that the case is remanded for further proceedings:

### Procedural History

Grippo applied for DIB on July 21, 2009, claiming that she became unable to work on August 21, 2008. (Administrative Record ("A.R.") 165.) After her claims

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

were denied initially and upon reconsideration, (id. at 67-73), Grippo sought and was granted a hearing before an administrative law judge ("ALJ"), (id. at 109). The ALJ held a hearing on December 7, 2010, at which Grippo and a vocational expert provided testimony. (Id. at 36-66.) On January 12, 2011, the ALJ issued a decision finding that Grippo is not disabled within the meaning of the Social Security Act and denying her DIB claim. (Id. at 24-31.) When the Appeals Council denied Grippo's request for review, (id. at 1), the ALJ's denial of benefits became the final decision of the Commissioner, *see Schomas v. Astrue*, 732 F.3d 702, 707 (7th Cir. 2013). On July 31, 2012, Grippo filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

Grippo, who currently is 58 years old, suffers from a number of ailments including arthritis of the lumbar spine and right knee, diabetes, plantar fasciitis, sleep apnea, obesity, and hypertension. She claims that those conditions became disabling in 2008, when she stopped working as a warehouse manager at a service station supplier. (A.R. 176.) Since she stopped working Grippo has continued to suffer from osteoarthritis and hypertension linked to her obesity and has experienced depression in the wake of her husband's death in October 2008. At her hearing before an ALJ, Grippo presented both documentary and testimonial evidence in support of her claim.

## A.    Medical Evidence

The bulk of the medical evidence Grippo submitted in support of her claim consists of treatment records from her visits with several doctors under the supervision of attending physician Dr. Robert Passovoy.  Those records begin in January 2008 when she reported experiencing severe headaches for two months. (A.R. 299.)  The treatment provider noted that she had "2x pedal edema" and osteoarthritis with knee pain.  (Id.)  The next month she returned to Dr. Passovoy's office reporting foot pain and intermittent pain bending over.  (Id. at 290.) Dr. Passovoy noted that she had a large heel spur in her right foot which another physician, Dr. Camilleri, had twice treated with injections.  (Id.)  Dr. Passovoy diagnosed plantar fasciitis with a heel spur, restless legs syndrome, and rectus abdominus soreness, likely attributable to her obesity.  (Id.)

Grippo visited Dr. Passovoy's office again in October 2008, the week after her husband passed away.  (Id. at 289.)  He noted that she was experiencing what he described as a "grief reaction/depression" and again noted "2x pedal edema."  (Id.) Dr. Passovoy gave Grippo a prescription for the arthritis medication Celebrex.  (Id.) After this visit Grippo returned to Dr. Passovoy in January and April 2009, complaining of headaches and dizziness.  (Id. at 239, 236.)  Grippo was concerned because she had an incident where she "zoned out" for one to two minutes and had vertigo.  (Id. at 236, 238.)  Dr. Passovoy attributed the symptoms to a respiratory viral infection.  (Id. at 236, 239.)  At the January 2009 visit Dr. Passovoy noted that

Grippo had controlled hypertension, was experiencing "mild to moderate clinical depression," and had degenerative arthritis in her knees and back. (Id. at 239.) He wrote that Grippo is "largely disabled by constant pain and stiffness and is requesting advice with regard to medical disability." (Id.)

Grippo returned to Dr. Passovoy in June 2009 for a diabetic check-up. Dr. Passovoy noted that Grippo's extremities were "abnormal" and that she had no change in her edema. (Id. at 235.) He wrote that she had glucose intolerance and "persistent" obesity. (Id.) The following month Grippo again reported to Dr. Passovoy's office complaining of another respiratory infection. (Id. at 234.) Grippo is a heavy smoker and the examining doctor discussed with her the importance of quitting. (Id.) The doctor noted in the records that Grippo continued to have pedal edema in her extremities and glucose intolerance. (Id. at 278.)

In October 2009 Dr. Passovoy provided a medical opinion letter in support of Grippo's DIB application describing her as a "medically complex" patient with problems including "hyperthyroid, chronic obstructive lung disease secondary to extensive tobacco abuse, gastroesophageal reflux disease, hypertension, persistent vertigo, restless leg syndrome, and variant migraine" as well as glucose intolerance. (Id. at 252.) Dr. Passovoy wrote that Grippo's "disabling condition is severe degenerative joint disease involving hips, knees, and back," which he said impairs her ability to move. (Id.) He also noted that Grippo's "morbid obesity"—at the time her body mass index was 43—contributes to her condition and her continuous "tobacco abuse with two-pack-per-day smoking" exacerbates "her chronic lung

disease." (Id.)  He opined that Grippo's joint disease and her chronic lung disease impair her ability to move and "feed into her inability to walk any distance at all without either fatigue or pain." (Id.)  Dr. Passovoy wrote that he would classify her as a "totally disabled" patient and opined that "the chances of her being rehabilitatable from the standpoint of her arthritis and obesity, are vanishingly small." (Id.)

About two weeks after Dr. Passovoy submitted his letter, consulting physician Dr. Mahesh Shah examined Grippo for the purpose of providing an internal medicine consultative examination for the state disability agency.  (Id. at 255-59.)  Grippo reported to Dr. Shah that she had joint problems and pain in her lower back, knees, and ankles and she had been taking Relafen for 10 years to control her pain. (Id. at 255.)  She reported that she was unable to stand or walk for a long time, to bend forward, or to pick up anything heavy.  (Id.)  Grippo also reported that she had been diagnosed with diabetes for four years and that she becomes dizzy with sudden movements.  (Id.)  Grippo had been smoking for 39 years and at the time of the examination she was smoking two packs of cigarettes a day. (Id. at 256.)

Under the "general appearance" section of his report, Dr. Shah noted that Grippo walked into the office with a cane but could walk slowly without it and displayed no acute distress.  (Id.)  Grippo had difficulties getting on and off the examining table but had no problem going from sitting to the supine position and getting up from the supine position.  (Id.)  Examination of the back revealed marked

tenderness in the lumbar region, but there were no deformities and no paraspinal muscle spasms. (Id. at 257.) Dr. Shah noted, however, that Grippo "could not stoop." (Id.) He observed that she had mild, vague tenderness over the shoulders, elbows, knees, and ankles, but noted that Grippo had full range of motion in the ankles, shoulders, and wrists, and the rest of the joints were normal. (Id.) In Dr. Shah's clinical impression, Grippo suffers from "severe arthritis, particularly involving the lumbar spine and right knee," and he wrote that Grippo's weight could "make the arthritis worse." (Id. at 258.) Two x-rays taken in connection with the consultative exam revealed that Grippo had degenerative disc disease at the L5-S1 level in her lumbar spine and a mild degree of degenerative disease in her right knee. (Id. at 259.)

Two weeks after Dr. Shah conducted his examination, Dr. Vidya Madala, a state agency review physician, provided a physical residual functional capacity ("RFC") assessment in November 2009. (Id. at 260-267.) Dr. Madala opined that Grippo could stand and walk at least two hours and sit for about six hours in an eight-hour workday. (Id.) In regard to postural limitations, Dr. Madala noted that she can "occasionally" stoop or climb ramps and stairs. (Id. at 262.) With respect to environmental limitations, Dr. Madala indicated that Grippo should avoid concentrated exposure to humidity, fumes, odors, dusts, gases, and poor ventilation. (Id. at 264.) Dr. Madala reviewed Dr. Passovoy's October 2009 letter supporting Grippo's claim, but wrote that his opinion that "Grippo is unable to walk any distance at all due to pain or fatigue from her arthritis" is not supported by Grippo's

"degree of functional loss or severity of conditions." (Id. at 266.) At the same time, Dr. Madala wrote that Grippo's allegations that she has difficulty lifting, squatting, bending, standing, sitting, kneeling, climbing stairs, and walking more than 100 feet are "generally credible and supported by MDIs." (Id. at 267.)

About a month after Dr. Madala completed her RFC assessment, Grippo returned to Dr. Passovoy's office reporting depression. (Id. at 274.) She said that she is "[c]onstantly sad and has no resources." (Id.) The following month she was again seen by Dr. Passovoy's office and the examining doctor noted that her disability claim had been denied "despite the fact that she has fairly significant limitations due to spinal stenosis and degenerative arthritis." (Id. at 269.) The doctor noted that she had symptoms related to gastroesophageal reflux disease, degenerative arthritis, and obstructive sleep apnea that she treated with a CPAP machine. (Id.)

In January 2010 Dr. Passovoy completed an arthritis RFC questionnaire in support of Grippo's disability claim. (Id. at 307-09.) He reported diagnoses of degenerative joint disease and spinal stenosis with a fair to good prognosis. (Id. at 307.) He noted that Grippo's pain is located primarily in her low back, knee, and ankle, and that she experienced stiff shoulders. (Id.) Dr. Passovoy noted that her depression and obstructive sleep apnea would affect her pain and her symptoms were severe enough to "frequently" interfere with the attention and concentration needed to perform simple work tasks. (Id. at 308.) Functionally, he noted that she could walk two city blocks without pain, sit at one time for 20 minutes, and stand at

one time for 15 minutes.  (Id.)  He opined that she could sit, stand, or walk for less than two hours in an eight-hour workday.  (Id.)  He noted that she needs a job that permits shifting positions at will but that she does not need to elevate her legs or use assistive devices.  (Id. at 308-09.)  He also noted that her impairments would produce good days and bad days and that she is likely to be absent from work about four days per month.  (Id.)

The record shows that Grippo saw Dr. Passovoy two more times in 2010, in March and in September.  In the six months between those visits, Grippo ran out of medications.  She told Dr. Passovoy's office that she had not refilled her prescriptions because she could not afford to buy her medications.  (Id. at 320.)  As a result, at the September 2010 visit she presented as "edematous, itching and with multiple skin lesions on her legs from nocturnal scratching."  (Id.)  She had "pretibial edema with multiple excoriated papular lesions" and elevated hypertension "secondary to lack of medications."  (Id.)  The examining doctor wrote that the office would try to supplement her medications with samples and help her with medical assistance forms to try to help her obtain "critical medications."  (Id. at 320-21.)

The medical record also shows that between May 2008 and August 2010 Grippo saw Mark Camilleri, D.P.M., at the Ridgeland Foot and Ankle Center, for help with pain in her feet.  (Id. at 333-39.)  Those records show that Dr. Camilleri repeatedly performed toenail debridements and that he often indicated positive findings for edema.  (Id.)  In November 2010 Dr. Camilleri completed a physical

RFC questionnaire in support of Grippo's claim. (Id. at 340.) Dr. Camilleri rated Grippo's prognosis as "poor," noted her edema and diabetic neuropathy as objective findings, and opined that she requires routine diabetic foot care. (Id.) His opinions with respect to Grippo's functional limitations largely echoed Dr. Passovoy's, except that he noted that Grippo can sit at one time for about two hours but that she should elevate her legs to about 20 percent with prolonged sitting. (Id. at 341.) He also noted that she needs a cane to engage in occasional standing and walking. (Id. at 342.)

## B. Grippo's Hearing Testimony

Grippo described the nature of her conditions and their limiting effects to the ALJ during the hearing. She testified that she is about 5'1-1/2" tall and weighs about 250 pounds. (A.R. 44.) Grippo testified that she uses a prescribed cane during 80 to 90 percent of her day. (Id. at 45.) She said that she cannot lift herself up out of a chair without it. (Id.) She explained that she has trouble sitting for more than five to ten minutes in a straight-up chair and she cannot stand for more than ten minutes. (Id. at 56-57.) She testified that she is very afraid of going out, especially in the wintertime, because she might fall and have trouble getting back up without help. (Id. at 55-56.) Grippo said that she sees podiatrists every six weeks and that she was diagnosed with neuropathy in both feet. (Id. at 46.) She said that she uses orthotics to ease the pain stemming from her plantar fasciitis. (Id. at 49.)

Grippo testified that she does not take insulin but twice daily injects a shot of a medicine called Byetta for her diabetes. (Id. at 46-47.) Grippo has been taking an anti-depressant since her husband passed away. (Id. at 50-51.) She testified that she did not seek out a specialist to treat her depression because Dr. Passovoy did not refer her to anyone and her insurance will not cover it without a referral. (Id. at 51.) She also testified that she uses a CPAP machine for her obstructive sleep apnea and although the machine helps her sleeping, she still wakes up from the pain in her back or knees. (Id. at 47.) She wakes up every two hours and sometimes she cannot fall back to sleep because of the pain, which she said feels like "somebody [is] choking" her and "twisting" her back. (Id. at 48.) She feels that the pain is becoming more and more intense. (Id.) Grippo also testified that she takes Lasix to help reduce the water in her legs, but that her legs are "always swollen, 24/7, all year round." (Id. at 54.)

With respect to her activities of daily living, Grippo testified that she does not have a driver's license and that the last time she drove was about 10 years ago. (Id. at 44.) She lives with her daughter and her daughter drives her to all of her appointments. (Id. at 45, 56.) She testified that she can walk to the end of her block comfortably before her back begins to tighten up. (Id. at 49.) She is able to bathe and dress herself but she cannot do any household chores. (Id. at 52.) She sleeps a lot during the day, taking two or three naps, but she is not sure whether her fatigue is connected to her depression. (Id. at 51.) Grippo testified that she smokes and has tried to quit several times without success. (Id. at 49-50.)

## C.  Vocational Expert's Hearing Testimony

Vocational Expert ("VE") Edward Pagella answered the ALJ's questions regarding the kinds of jobs someone with certain hypothetical limitations could perform.  (A.R. 58.)  First, the VE explained that Grippo's previous jobs as a warehouse manager and a treasury assistant are both semi-skilled occupations and that the warehouse manager position had a light level of physical tolerance while the treasury assistant position was sedentary.  (Id. at 59-60.)  The ALJ then asked his opinion as to whether a hypothetical individual the same age as Grippo, with the same high school education level and the same past work experience, and with the functional capacity to lift 10 pounds frequently and lift 20 pounds occasionally, to stand or walk for no more than two hours, to sit for six hours, to climb ramps or stairs occasionally, to balance, stoop, kneel, crouch, or crawl occasionally, with a limitation requiring her to avoid concentrated exposure to humidity and fumes, would be able to perform any of Grippo's past work.  (Id. at 60-61.)  The VE answered that such an individual would be capable of performing Grippo's prior work as a treasury assistant doing accounts payable.  (Id. at 62.)

The ALJ then modified the hypothetical by adding restrictions including the ability to walk no more than two blocks, sit no more than 20 minutes at a time, stand no more than 15 minutes at a time, and sit, stand or walk less than two hours during an eight-hour workday.  In addition, the ALJ instructed the VE to assume this hypothetical person would miss four days of work per month.  (Id. at 62-63.)  The VE responded that there is no work available for that hypothetical individual.

(Id. at 63.)   The VE also confirmed that his testimony was consistent with the Dictionary of Occupational Titles ("DOT").   (Id.)   Grippo's attorney did not ask the VE any follow-up questions.   (Id. at 64.)

**E.      The ALJ's Decision**

The ALJ concluded that Grippo is not disabled under sections 216(i) and 223(d) of the Social Security Act.   (A.R. 31.)   In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires her to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [she] can perform [her] past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).   If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, she must "assess and make a finding about [the claimant's RFC] based on all the relevant medical and other evidence."   20 C.F.R. § 404.1520(e).   The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to her past work or to different available work.   *Id.* § 404.1520(f),(g).

Here, at steps one and two of the analysis, the ALJ concluded that Grippo has not engaged in substantial gainful activity since August 21, 2008, and that she has the following severe impairments: arthritis of the lumbar spine and right knee,

obesity, diabetes, plantar fasciitis, sleep apnea, and hypertension.  (A.R. 26.)  The ALJ characterized Grippo's gastroesophageal reflux disease, asthma, and depression as non-severe impairments.  (Id. at 26-27.)  At step three, the ALJ concluded that Grippo does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Id. at 27.)  Before moving to step four, the ALJ concluded that Grippo has the RFC to perform sedentary work except that she may never climb ladders, ropes, or scaffolds, and only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl.  (Id.)  Additionally, the ALJ concluded that she must avoid concentrated exposure to humidity and fumes, odors, dusts, gases, and poor ventilation.  (Id.)  At step four, the ALJ found that Grippo's RFC allows her to perform her past relevant work as a treasury assistant.  (Id. at 31.)  Accordingly, the ALJ found that Grippo is not under a disability as defined by the Social Security Act and denied her application for benefits.  (Id.)

## Analysis

Grippo raises a number of challenges to the ALJ's decision in her motion for summary judgment.  Grippo first argues that the ALJ improperly weighed competing medical opinions, ignoring one, wrongly elevating another, and failing to explain what weight she gave to a third.  Grippo also argues that the ALJ improperly failed to apply the "special technique" that applies to mental impairments in evaluating Grippo's depression, improperly evaluated her credibility, and insufficiently explained her RFC assessment.  Finally, Grippo

argues that the ALJ committed reversible error in failing to discuss the specific functions of Grippo's previous work as a treasury assistant or to obtain the DOT code for that job. The Commissioner counters that the ALJ's decision was reasonable and supported by substantial evidence in all relevant respects.

This court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence and free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which "'a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has adequate support, this court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). But nor will it "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). If the ALJ's decision "lacks an adequate discussion of the issues, it will be remanded." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

## A. Treating Physicians' Opinions

Grippo's first challenge to the ALJ's treatment of the medical opinions of record comes in her argument that the ALJ erred in weighing competing medical

opinions. Specifically, she argues that the ALJ erred by giving "some weight" to the opinion of a non-examining state agency reviewing physician, Dr. Madala, but "no controlling weight" to that of Grippo's treating physician, Dr. Passovoy, and "no weight" to the opinion of Dr. Camilleri, her podiatrist. A treating physician's "opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record." *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). However, an ALJ "may discount a treating physician's medical opinion if the opinion 'is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.'" *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Skarbek*, 390 F.3d at 503). Where conflicting opinion evidence exists, "it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992).

Here, the ALJ cited a lack of support in the objective record and inconsistencies in the treatment notes in support of her decision to give "no weight" to Dr. Camilleri's RFC opinion. (A.R. 30.) The ALJ noted that Dr. Camilleri treated Grippo for toenail fungus and performed debridement of the toenails, treatment she

characterized as "rather conservative" and not in alignment with the drastic lower extremity limitations that Dr. Camilleri described in his RFC. (Id.) She noted that Dr. Camilleri's records do not suggest that he ever counseled Grippo to follow the limitations he described in his RFC. (Id.) The ALJ is entitled to discount a treating physician's opinion based on an inconsistency between the described limitations and his actual treatment records. *See* 20 C.F.R. 404.1527(c); *Skarbek*, 390 F.3d at 503-04. She was also entitled to rely on the fact that Dr. Camilleri only treated Grippo for a foot condition that is tangentially related to what she claims is her disabling impairment—arthritic pain exacerbated by obesity—in giving less weight to his opinions regarding her limitations in things like sitting and standing. *See Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (noting that ALJ may consider treating physician's specialty in weighing medical opinion). Because the ALJ adequately explained her decision to disregard Dr. Camilleri's opinion, she did not commit reversible error in assigning it no weight.

The ALJ's weighing of Dr. Passovoy's opinion as compared to Dr. Madala's is more problematic and muddied by the fact that she never explained what weight she gave to Dr. Passovoy's 2010 RFC opinion. The ALJ wrote that she gave Dr. Passovoy's 2010 opinion "no controlling weight" because she found that it is "not supported by the objective medical evidence of record," but she never identified what weight less than controlling weight she gave it or why. (A.R. 30.) An ALJ's decision not to afford a treating physician's opinion controlling weight does not end the analysis; "the ALJ may still look to the opinion after opting to afford it less

evidentiary weight." *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Accordingly, even where the ALJ finds the opinion is not entitled to controlling weight, "the ALJ still would have been required to determine what value the assessment did merit." *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Campbell*, 627 F.3d at 308. This court has explained that an "ALJ's decision cannot leave the weight given to the treating physician's testimony to mere inference: the decision must be sufficiently specific to make clear to any subsequent reviewers the weight the ALJ gave to the treating source's medical opinion and the reasons for that weight." *Ridigner v. Astrue*, 589 F. Supp. 2d 995, 1006 (N.D. Ill. 2008) (internal quotation omitted).

Here the ALJ provided no analysis to help this court understand what weight below controlling weight she assigned to Dr. Passovoy's opinion. That silence supports an inference that once the ALJ decided that Dr. Passovoy's opinion was not entitled to controlling weight she failed to give it any further consideration. That is especially troubling because Dr. Passovoy's opinion, including the stricture that Grippo is likely to have good days and bad days and therefore be absent from work four days each month, suggests limitations that the VE testified would preclude full-time work. (A.R. 30, 63.) The court cannot discern from the ALJ's opinion what weight the ALJ gave to Dr. Passovoy's opinion or why.

Grippo also accurately points out that the ALJ failed to "mention, discuss, or analyze" the 2009 opinion letter Dr. Passovoy submitted in support of her disability application in which he opined that Grippo's "disabling condition" was severe

degenerative joint disease, stemming from her morbid obesity.    (A.R. 252.)

Dr. Passovoy wrote that he would classify Grippo as a "totally disabled" patient and

noted that he believed her chance of rehabilitation to be "vanishingly small."  (Id.)

In its response brief, the Commissioner acknowledges that the ALJ ignored this

letter but argues that this oversight does not amount to reversible error because the

question of Grippo's disability is an outcome-determinative question ultimately

reserved for the Commissioner.  (R. 16, Resp. at 5 n.3.)

Although it is true that the ALJ was not required to give controlling weight

to Dr. Passovoy's opinion regarding Grippo's disability because that finding is

specifically reserved for the Commissioner, 20 C.F.R. § 404.1527(d)(1); *Dixon v.

Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001), she was not entitled to ignore it

altogether, *see Roddy*, 705 F.3d at 638.  The ALJ is required to consider all opinions

stemming from medical sources in determining the claimant's RFC, including those

on an ultimate issue like whether the claimant is disabled.  *Barnett v. Barnhart*,

381 F.3d 664, 669 (7th Cir. 2004).   In fact, the relevant policy interpretation

specifically states that "opinions from any medical source on issues reserved to the

Commissioner must never be ignored."  SSR 96-5p, 1996 WL 374183, at *3 (July 2,

1996).   Because the ALJ did not mention Dr. Passovoy's 2009 opinion at all, let

alone explain how she weighed it, the court cannot discern whether she considered

his assessment of how her obesity contributes to the limitations stemming from her

degenerative joint disease or his opinion that her condition is unlikely to improve.

Accordingly, the case must be remanded so that the ALJ can explain what weight

she gave Dr. Passovoy's 2009 and 2010 opinions and why. *See* 20 C.F.R. § 404.1527(c) (noting that the Commissioner "will evaluate every medical opinion we receive"); *Barnett*, 381 F.3d at 669-70 (reversing and remanding where ALJ failed to consider treating physician's opinion regarding disability).

## B. Application of the Special Technique

Grippo next argues that in determining the severity of her depression the ALJ erroneously failed to apply the "special technique" that applies to mental impairments. *See* 20 C.F.R. § 404.1520a. The special technique is a tool that the ALJ uses to rate the severity of a claimant's mental impairments. *Schmidt*, 496 F.3d at 845 n.4. The special technique requires the ALJ first to evaluate a claimant's "symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment." 20 C.F.R. § 404.1520a(b). If the ALJ determines that the claimant has a medically determinable mental impairment, she must then rate the degree of resulting functional limitations in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *See* 20 C.F.R. § 404.1520a(c)(3); *Pepper* 712 F.3d at 365.

The ALJ did not explicitly apply the special technique when evaluating Grippo's depression. Instead, at step two the ALJ noted that Grippo had reported "mild depression" and received "temporary treatment," but stated that there "is no evidence of any work-related limitations lasting for 12 months from depression." (A.R. 27.) Accordingly, the ALJ labeled Grippo's depression "non-severe" and did

not include any further analysis of the condition anywhere in the decision. (Id.) The Commissioner argues that the ALJ's failure to explicitly engage the special technique is harmless because the ALJ provided sufficient reasoning to support her conclusion that Grippo's depression is not severe and because she "implicitly" considered the special technique factors in discussing Grippo's daily activities and social functioning at the RFC stage. (R. 16, Resp. at 8-9.) According to the Commissioner, the record supports the ALJ's conclusion that Grippo's depression was mild and short-lived. (Id.)

The Commissioner is correct that "under some circumstances, the failure to explicitly use the special technique may be harmless error," but that is true only where the ALJ provides "enough information to support the 'not severe' finding," and those reasons are supported by medical evidence. *See Pepper,* 712 F.3d at 366 (internal quotation omitted). Here, in support of her conclusion that there is no evidence that Grippo's depression caused work-related limitations for a 12-month period, the ALJ offers only two sentences of analysis. First, she asserts that Grippo reported only "mild depression around the time her husband died and received temporary treatment for this condition." (A.R. 27.) That statement overlooks substantial evidence suggesting that Grippo's depression lasted long beyond her husband's death in October 2008 and was not always "mild." Treatment notes from two and a half months after Grippo's loss of her husband state that she was experiencing "mild to moderate clinical depression." (Id. at 239.) Fourteen months after his death Dr. Passovoy's notes reflect that Grippo was still experiencing

depression and that she was "constantly sad." (Id. at 274.) In his January 2010 RFC assessment Dr. Passovoy cited depression as a factor in her limiting conditions. (Id. at 308.) When Grippo sought emergency-room treatment after a June 2010 fall she reported to the ER doctor that she had a history of depression. (Id. at 327.) The ALJ acknowledged elsewhere in her decision that Grippo testified at her December 2010 hearing that she had been taking anti-depressants since her husband's death, a period spanning 26 months at that point. (Id. at 28.) She also testified that she did not know whether it was depression that was causing her to nap two or three times every day. (Id. at 51.) Thus there is at least some evidence that Grippo's depression was neither mild nor temporary; evidence that the ALJ overlooked in by-passing the special technique.

The second reason the ALJ gave to support her conclusion that Grippo's depression is not severe is that Grippo "does not see a mental health provider." (A.R. 27.) That assertion is correct, but fails to acknowledge the reasons Grippo gave for her decision to forego seeking out mental-health treatment. Grippo explained that Dr. Passovoy had prescribed her an anti-depressant and that she was continuing to take that medication. (Id. at 50-51.) She further explained that she is unable to afford the cost of seeing a specialist without a referral. (Id. at 51.) The ALJ asked no follow-up questions to resolve why Dr. Passovoy had not given her a referral or whether she had ever expressly sought a mental-health referral. (Id.) An ALJ has an obligation to explore the reasons why a claimant fails to seek treatment before holding the lack of treatment against her. *See Craft v. Astrue*, 539

F.3d 668, 678-79 (7th Cir. 2008). Because the ALJ did not explore Grippo's reasons here, nor consider her apparent ability to get depression medication from Dr. Passovoy, her decision to hold against Grippo her failure to seek out a mental health specialist is insufficiently explained.

The Commissioner argues that the ALJ's curt analysis and failure to engage with the special technique is harmless because the ALJ "implicitly" factored her depression-related limitations into the analysis by discussing Grippo's daily activities and level of social functioning at the RFC stage. But "the RFC analysis is not a substitute for the special technique, even though some of the evidence considered may overlap." *Craft*, 539 F.3d at 675. And here, the ALJ never conducted any analysis regarding how any limitations in her daily activities factor into her ability to work. The ALJ noted in the context of recounting Grippo's description of her daily activities that she did "not require reminders to take her medication or perform personal care and stated that she socialized weekly." (A.R. 28.) But nowhere in the RFC does the ALJ acknowledge the evidence that Grippo was "constantly sad," (id. at 274), or analyze how her possibly depression-related urge to sleep for large chunks of the day impacts her RFC. Because the ALJ largely glossed over the evidence surrounding Grippo's on-going depression, her RFC analysis does not make up for her failure to engage in the special technique at step two. *See Craft*, 539 F.3d at 675. Accordingly, on remand, the ALJ should reanalyze the evidence surrounding Grippo's depression in the context of the special technique.

## C.    Credibility Analysis

Grippo argues that the ALJ improperly evaluated her credibility by inadequately evaluating her alleged arthritis pain, failing to discuss her activities of daily living, and overlooking her excellent work history.   Grippo's burden in challenging the credibility determination is especially high, because this court may only overturn an ALJ's credibility assessment if it is "patently wrong."  *See Skarbek*, 390 F.3d at 504.   That means that this court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and Grippo "must do more than point to a different conclusion that the ALJ could have reached."  *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).  But the court has greater freedom in reviewing a credibility determination which "rests on objective factors or fundamental implausibilities rather than subjective considerations."  *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (internal quotation omitted).

There are two paragraphs in the ALJ's decision that constitute the credibility analysis.   The first is an iteration of a standard template paragraph that the Seventh Circuit has characterized as "'meaningless boilerplate'" that does not support an adverse credibility finding unless the ALJ provides separate reasons. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (quoting *Pepper*, 712 F.3d at 367-68); (A.R. 28).  Thus the only actual analysis of Grippo's credibility appears in the second paragraph, which reads in its entirety as follows:

> I am not persuaded that the claimant's intense episodes of pain have been so frequent or long lasting that they have precluded all work at all exertional levels at all times material to this decision.  Although the claimant has received treatment for the allegedly disabling

impairment(s), that treatment has been essentially routine and/or conservative in nature. Additionally, she has not alleged any side effects from the use of her medications. I also note that despite the claimant's testimony that she has neuropathy in her feet, the medical record does not contain any testing to substantiate this claim. Nevertheless, giving the claimant the benefit of every doubt, I have restricted her to a limited range of sedentary work.

(A.R. 29.) In other words, the ALJ gave three reasons for discounting Grippo's pain allegations: conservative treatment, a lack of medication side effects, and the absence of testing to support her testimony regarding neuropathy. (Id.)

With respect to the first reason, despite the deferential standard of review, Grippo has persuasively shown that the ALJ failed to establish a link between "routine and/or conservative treatment" and the level of pain Grippo alleges. As discussed above, the ALJ must build a "logical bridge" between the evidence and her conclusion according to the substantial evidence standard. *See Pepper,* 712 F.3d at 362. Although in some cases conservative treatment may support a finding that the claimant is exaggerating her symptoms, here the ALJ has not explained why Dr. Passovoy's decision to treat Grippo's arthritis pain with medication constitutes conservative treatment. *See Schomas*, 732 F.3d at 709 (contrasting "conservative" treatment like over-the-counter medication with "more aggressive" treatment like prescription narcotics and steroid injections). Dr. Passovoy prescribed Grippo two separate pain medications to ease her arthritis pain, and she supplemented the prescription medications with extra strength acetaminophen. (A.R. 210.) The ALJ also failed to address how Grippo's morbid obesity (her BMI has been charted at 43) might exacerbate her arthritis pain or reduce the feasibility of more aggressive

treatment options. *See Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) ("It is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40."). If the record supported a finding that Grippo's physician recommended alternate pain treatments that she rejected, that fact may reduce the credibility of her allegations with respect to the limiting impact of her pain. But here Dr. Passovoy explicitly characterized the combination of Grippo's obesity and arthritis as a condition for which the chances of rehabilitation are "vanishingly small." (A.R. 252.) As explained above, the ALJ failed to discuss that opinion. Because the ALJ did not explain why she considered treatment of Grippo's arthritis with pain medication to be a "conservative" course of treatment, nor acknowledge her physician's opinion suggesting a lack of treatment options for her combination of impairments, the first reason she gave for discounting Grippo's credibility lacks adequate support.

Nor do the remaining two reasons the ALJ gave to explain her credibility decision rescue the analysis. The ALJ doubted Grippo's credibility because "she has not alleged any side effects from the use of her medications." (Id. at 29.) That statement offers no window into why the ALJ doubted Grippo's sincerity. Did the ALJ believe that Grippo's prescribed medications should cause side effects and therefore conclude that Grippo was lying about taking them? Did she believe that side effects are an inevitable condition in conjunction with prescribed pain treatment? The court does not understand why Grippo's failure to acknowledge

medication side effects supports a finding that she is exaggerating her pain. The ALJ will have to flesh out what she means on remand.

Finally, the ALJ cites a lack of neuropathy testing to justify her decision to discredit Grippo's testimony that she has neuropathy in her feet. The ALJ does not say what testing a physician would typically order in the course of treating neuropathy in a diabetic patient. The record provides ample support for Grippo's claim of foot pain, given that she saw a podiatrist for help with her feet throughout the course of the years documented in the medical record. (A.R. 333-39.) Indeed, Dr. Camilleri noted in his RFC questionnaire that his clinical findings suggest a diagnosis of diabetic neuropathy. (Id. at 340.) That record evidence supports the portion of Grippo's testimony that the ALJ appears to be discrediting, in which she said that her podiatrist had diagnosed neuropathy. (Id. at 46.) Thus regardless of whether a doctor would have ordered more objective testing to substantiate a neuropathy diagnosis, Grippo's only testimony on the matter is entirely consistent with her podiatrist's findings. (Id. 46, 340.) She said her podiatrist diagnosed neuropathy, and so he did. (Id.) Thus none of the three reasons the ALJ gave for her credibility analysis find sufficient record support. Accordingly, the case must be remanded for a new credibility finding. *See Pierce*, 739 F.3d at 1051 ("An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding.").

## D. Grippo's Remaining Arguments

Although the court need not address in detail Grippo's challenges to the RFC assessment given its conclusion that a remand is necessary in connection with the ALJ's credibility analysis, weighing of the medical opinions, and failure to use the special technique, *see Pierce*, 739 F.3d at 1051, the court will address them briefly in the interest of thoroughness. The ALJ concluded that Grippo maintains the ability to perform less than the full range of sedentary work with only occasional stooping. (A.R. 27.) Grippo argues that the ALJ failed to provide a sufficient narrative in support of her conclusion that Grippo can sit for six hours in the course of an eight-hour day, a requirement for sedentary work. *See* SSR 83-10, 1983 WL 31251, at *5 (1983). She faults the ALJ for failing to explain sufficiently how she factored Dr. Passovoy's opinion that she can sit for no more than two hours into the analysis, or what weight she gave to Grippo's testimony regarding her sitting limitations. Because the court is remanding for a further discussion of the ALJ's weighing of the cited testimony, the ALJ will have the opportunity to more fully explain her conclusion that Grippo is capable for sitting for six hours, and should do so.

Grippo also argues that the ALJ erroneously failed to resolve conflicts in the evidence surrounding Grippo's ability to stoop. She points out that the ALJ listed among the medical evidence Grippo's report to Dr. Shah that she could not bend forward. But Dr. Shah did not rely on her report; he observed that Grippo "could not stoop" during his examination. (A.R. 257.) Grippo further argues that the ALJ

must have relied on Dr. Madala's RFC opining that Grippo can stoop "occasionally," but points out that the report has an internal conflict. Specifically, Dr. Madala checked a box indicating that Grippo is able to stoop occasionally, but in the narrative portion of her opinion Dr. Madala recognized that Dr. Shah found that Grippo could not stoop during the consultative examination. (Id. at 262, 267.) Dr. Madala also found generally credible Grippo's assertion that she needs help putting on her shoes and socks and has difficulty bending. (Id. at 267.) The ALJ is required to assess Grippo's ability to stoop "based on all of the relevant medical and other evidence." *See* 20 C.F.R. § 404.1545(a)(3). Given these evidentiary conflicts, on remand the ALJ should explain what evidence she relied on to determine that Grippo can perform sedentary work that requires occasional stooping.

Lastly, Grippo argues that the ALJ's analysis of Grippo's obesity is insufficient because it fails to explain how she factored Grippo's obesity into her RFC assessment. In determining the RFC, an ALJ should keep in mind that the "combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-01p, 2000 WL 628049, at *1 (Sept. 12, 2002). Here, the ALJ acknowledged that Grippo is obese and summarily wrote that she "considered the claimant's obesity, within the guidelines of Social Security Ruling 02-01p" in evaluating the RFC. (A.R. 29.) But the Seventh Circuit has noted that it is insufficient for an ALJ to simply acknowledge a claimant's extreme obesity. *See Martinez*, 630 F.3d at 698. Rather, it is "gravest error" for the ALJ to fail to consider the aggregate impact of extreme obesity on

arthritis-related pain. *Id.* at 698-99. That is because even if a claimant's "arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both." *See Barrett v. Barnhart*, 355 F.3d 1065 1068 (7th Cir. 2004). Accordingly, on remand the ALJ should explicitly consider how Grippo's severe obesity interacts with her arthritis pain, and how that combination impacts her RFC.

Grippo's final argument is that the ALJ erred in finding that she could return to her past relevant work because the ALJ failed to analyze the specific functions of Grippo's past relevant work as a treasury assistant and the VE failed to provide the DOT code for that position. Because the ALJ will have to reassess Grippo's RFC on remand, the court need not address this argument in detail, other than to note that any changes in the ALJ's assessment of Grippo's capacity to stoop may impact her ability to perform her past relevant work. *See* SSR 85-15, 1985 WL 56857, at *7 (1985) (noting that "[s]ome stooping . . . is required to do almost any kind of work"). The ALJ should explicitly address that impact if she reassesses Grippo's stooping capacity but again concludes that Grippo is capable of working as a treasury assistant. *See* SSR 96-9p, 1996 WL 374185, at *8 (July 2, 1996) ("Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping."). The ALJ also should ensure that the VE provides the correct DOT number in analyzing whether Grippo's abilities are consistent with the treasury-assistant position.

## Conclusion

For the foregoing reasons, Grippo's motion for summary judgment is granted to the extent that the case is remanded for further proceedings.

**ENTER:**

_____

**Young B. Kim**
**United States Magistrate Judge**